**James WATKINS alias Doc Broadus and Hattie Watkins, Appellants,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

April 2, 1971.

George O. Eldred, Edward H. Johnstone, Johnstone & Eldred, Princeton, for appellants.

John B. Breckinridge, Atty. Gen., David E. Murrell, Asst. Atty. Gen., for appellee.

PALMORE, Judge.

The appellants, James Watkins (alias Doc Broadus) and wife, Hattie Watkins, were convicted on six counts of hog stealing and sentenced to one year's imprisonment on each count, the sentences to run consecutively. KRS 433.250(2); RCr 11.04 (1). They appeal, contending that the trial court erred in permitting the introduction of evidence obtained under a search warrant that was never produced at the trial, in declining to require production of the warrant, and in instructing the jury.

At various times between September 1969 and March 1970 hogs were stolen from the farm of Bill Williams in Lyon County. In the course of his investigations Williams discovered some of these hogs in the possession of several different people in neighboring Caldwell County, all of whom had bought them from Broadus or his wife. Ten of Williams' hogs had been stolen on March 3, 1970, and on the afternoon of March 8, 1970, he went to the home of Broadus in Caldwell County. He described this visit as follows:

"So I decided I would go and have a talk with him about the hogs and see if he could tell me anything about it, so I went to his home and knocked on the door and hollered a time or two and didn't anybody answer and while I was standing there on the porch waiting to see if anybody on the inside would answer me I heard some hogs and I backed up to the edge of the porch where I could see and the hogs came out of the building and around the side of the fence and there was 20 of my hogs there in his pen."

Q. "How did you know they were your hogs, Mr. Williams?"

A. "Well, I knew the hogs from several reasons. I don't think I would have had to had any marks on them, but we had marked these gilts with a swallow fork in their left ear, all the gilts we intended for brood sows out of this

group and he had 6 of those in there and then all the hogs we had cut switches off their tails to try to eliminate some tail biting we had on the feeding floors and all of them had switches cut off their tails."

Q. "What about the size; were they the same size hogs that you lost?"

A. "Yes, sir, they were the same size that had been stolen."

Q. "And what kind of marking did you have on them; was it similar to the hogs you were raising?"

A. "Well, in this particular group there was 6 Hampshire and 3 of the gilts had swallow forks in their ears, 1 black and white spotted gilt, and 13 white gilts and 3 of the white gilts had swallow forks in their left ear."  .

Q. "So 6 of these hogs had swallow fork markings in their ear?"

A. "That's right, the gilts that we had marked for keeping. We do that when the litters are born so, in trying to improve our hogs, we can keep gilts out of large litters, and litters out of sows do exceptionally well, and we mark our gilts when they are small—that don't mean we will keep them every one, because they would be culled again at 180 pounds when we turn them out on the ground to keep.

Q. "All right, what did you do after you saw these 20 hogs in the defendant's lot?"

A. "Well, after I—right immediately I didn't do anything that day until a little after dark I was still investigating some other hogs that I heard about and I found several more of my hogs at other places."

It was after Williams had thus observed and identified 20 of his hogs in Broadus' pen that the controversial search warrant was issued and executed. At the beginning of the trial counsel for Broadus de-

manded that it be produced for inspection, but the motion was overruled in view of assurances by the Commonwealth that its case would not depend upon any evidence obtained by virtue of the warrant. These assurances proved to be reliable until the very end of the Commonwealth's production of testimony, at which point its last witness, the sheriff of Caldwell County, was permitted over objection of defense counsel to testify that he had "found 20 pigs at Doc Broadus' premises that belonged to Bill Williams." It was then developed through cross-examination that he had done so by virtue of a search warrant. Defense motions to exclude this testimony and to declare a mistrial were overruled. From other evidence heard in chambers it appears that the missing search warrant had been issued by the county judge of Lyon County.

■ It may be conceded that the admission of evidence relating to or gathered as the result of the search of Broadus' premises without requiring the Commonwealth to produce the warrant purporting to authorize the search was an error. See, for example, Carroll v. Commonwealth, Ky., 294 S.W.2d 938 (1956). Ordinarily such an error, being of constitutional proportions, would be prejudicial and require reversal, but not necessarily. In this instance the tainted evidence merely corroborated other evidence which alone had such probative weight that we have no hesitation in finding that the error was harmless beyond peradventure of a doubt. Cf. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1968).

There was, for example, in addition to the testimony of Williams, that of the principal thieves themselves, Partee and Blue, who admitted having delivered the hogs to the Broadus place, and that of six or eight other witnesses who had purchased from Broadus hogs later found to belong to Williams. In the final analysis, quite aside from the minimal ripple of information contributed by the sheriff's testimony, there was only one possible defense for

Broadus and wife in the case, and that was that they did not have anything to do with the stealing of the hogs and, in receiving them, did not know they had been stolen. That, exactly, is the avenue they took. It is scarcely conceivable that they could have mounted a successful defense upon a disclaimer of possession even if the illegal search and seizure had never taken place. That the jury refused to believe them could not have been influenced by the incompetent evidence.

The indictment charged Doc, Hattie, Partee and Blue jointly as principals. It was clear from the evidence that Doc and Hattie did not go to Lyon County and were never present, actually or constructively, when the hogs were abducted by Partee and Blue. Hence the case against Doc and Hattie necessarily depended on the theory that they were accessories before the fact. The instructions given by the trial court under the various counts of the indictment were patterned as follows:

"COUNT No. 1: If the jury believe from all the evidence in this case, to the exclusion of a reasonable doubt that the defendants, James Watkins (alias Doc Broadus) and Hattie Watkins, being then in Caldwell County, Kentucky, did in Caldwell County, Kentucky, aid, abet or procure Larry Partee or Howard Troy Blue, Jr., both of Lyon County, Kentucky, on the _____ day of September, 1969, and before the finding of this indictment, to and said Partee and Blue did then and in Lyon County, Kentucky, unlawfully take, steal, and carry away 10 hogs of the value each of $4.00, or more, the personal property of Bill Williams, said defendants, Watkins having the felonious and fraudulent intent then and there to convert the same to said defendants' own use, and to deprive permanently the said Bill Williams of his property therein, without the consent of the said Bill Williams, then the jury will find said defendant, or defendants, so offending, guilty of hog stealing and fix his, or hers, or their punishment at

confinement in the penitentiary, for not less than one nor more than five years, in your discretion."

■ It is contended that the instructions were erroneous because they authorized conviction on the theory of aiding and abetting without any evidentiary basis for such a finding. If the instructions really were susceptible of that construction this argument would be well taken. Fairly read, however, despite the words "aid" and "abet" the sample instruction is not an instruction on aiding and abetting, but is an instruction submitting the theory of accessory before the fact.

■ The line of definition between an aider and abettor and an accessory is drawn according to the presence or absence of the accused. It is hard to improve upon Blackstone's explanation of the distinction:

"I. A man may be *principal* in an offense in two degrees. A principal in the first degree is he that is the actor or absolute perpetrator of the crime; and in the second degree he is who is present, aiding and abetting the fact to be done. Which *presence* need not always be an actual immediate standing by, within sight or hearing of the fact; but there may be also a constructive presence, as when one commits a robbery or murder and another keeps watch or guard at some convenient distance. * * * II. An *accessary* is he who is not the chief actor in the offense, nor present at its performance, but is some way concerned therein, either *before* or *after* the fact committed. * * * 2. As to the second point, who may be an accessary *before* the fact; Sir Matthew Hale defines him to be one who, being absent at the time of the crime committed, doth yet procure, counsel, or command another to commit a crime. Herein absence is necessary to make him an accessary; for if such procurer, or the like, be present, he is guilty of the crime as principal." IV Blackstone's Commentaries

on the Laws of England, pp. 34–37 (Lewis' ed., 1897).

"The common law distinction between principals and accessories has not been abolished. * * * But the crime of accessory before the fact has by the statute been stripped of the confusing distinction of the common law, and now it is the settled law of this state that the principal actor, the aider and abettor and the accessory before the fact, are all principals in the first degree, in legal effect, and equally guilty, and may be so accused and convicted on a proper allegation." Roberson's New Kentucky Criminal Law and Procedure, § 192, p. 279 (2d ed., 1927).

Only to lawyers would the words "aid" and "abet" convey the special magic of the common law distinction. Without further qualification in the instructions we do not believe jurors would construe them as contemplating a defendant's presence at the time the crime was consummated. In this instance the phraseology of the instructions clearly excluded such an inference. They required, as a condition of guilt, that Doc and Hattie "did *in Caldwell County*, Kentucky, aid, abet or procure Larry Partee or Howard Troy Blue, Jr., * * * to and said Partee and Blue did then *and in Lyon County*, Kentucky, unlawfully take, steal, and carry away," etc. (Emphasis added.) The terminology and sentence construction may have been somewhat awkward, but we do not believe the jurors could have misunderstood. The words "aid" and "abet" were mere surplusage and did not introduce any substantial defect in the instructions.

The last point argued by the appellants is that the instruction on reasonable doubt was fatally erroneous because it did not follow the traditional phraseology, now incorporated in RCr 9.56, to the effect that if there is a reasonable doubt of the defendant's having been *"proved* to be guilty"

(emphasis added) he is entitled to an acquittal. The instruction given was as follows:

"If upon the whole case the jury has a reasonable doubt as to the guilt of either, or both defendants, then they should acquit or find not guilty, the defendant, or defendants, concerning which they entertain such doubt."

Bearing in mind that jurors are sworn to try the case according to the evidence, the notion that a juror may believe beyond a reasonable doubt that a defendant is guilty and at the same time entertain a reasonable doubt that such guilt has been "proved" is an unacceptable anomaly. It should not be possible for a juror to believe beyond a reasonable doubt that a defendant is guilty unless it has been proved. An instruction telling the jurors "that if upon the whole case they had a reasonable doubt of the guilt of the accused or of any material fact necessary to constitute his guilt, they should find him not guilty," was upheld in Fitzpatrick v. Commonwealth, 245 Ky. 108, 53 S.W.2d 221 (1932). Cr.C. § 238 then provided, "If there is a reasonable doubt of the defendant's being proved to be guilty, he is entitled to an acquittal." It has never been held that this language with respect to *proof* of guilt be followed, "for a jury cannot believe a fact to the exclusion of a reasonable doubt if they have a reasonable doubt of the fact being proven. Instructions like this have often been approved." Charles v. Commonwealth, 222 Ky. 99, 300 S.W. 357, 358 (1927). As a matter of fact, we are of the opinion that it is preferable for the instruction to omit reference to the defendant's having been "proved" guilty, because if it leads to misunderstanding on the part of lawyers it is all the more likely to mislead juries.

The judgment is affirmed.

All concur.