Frank Thomas **BURTON**, Appellant,

v.

**COMMONWEALTH of Kentucky,** Appellee.

Supreme Court of Kentucky.

Feb. 18, 1977.

Rehearing Denied June 10, 1977.

David F. Broderick, Cole, Harned & Broderick, Bowling Green, for appellant.

Ed W. Hancock, Atty. Gen., Victor Fox, Asst. Atty. Gen., Frankfort, for appellee.

STEPHENSON, Justice.

Frank Burton was convicted of rape and sentenced to life imprisonment. We affirm.

Mabel (Mrs. Frank) Wiseman, an 80-year-old woman, was raped at her home on a Sunday afternoon. After the assailant left, Mrs. Wiseman attracted the attention of a neighbor who contacted the police. The police arrived at the house and, after sending Mrs. Wiseman to the hospital where the rape was confirmed by a physician, found a "Ringo hat" in the bedroom where the incident occurred. The police received information that Burton was wearing the hat on Sunday and that it belonged to Brad Primous. The police arrested Burton the following evening.

At the trial, the prosecution produced the following testimony. Mrs. Wiseman stated that two men came to her home and after entering, sexually assaulted her. She testified, "I think both of them did." She could not identify Burton or give any description of the men.

A neighbor testified that he saw a man wearing a yellow shirt and yellow trousers step off Mabel Wiseman's sidewalk onto the sidewalk and cross the street. The man was tucking his shirttail into his trousers. About five minutes later, he heard Mabel Wiseman screaming, went to the house and was told she had been raped. He testified Burton looked a lot like the man he saw, but he could not swear it was Burton. A yellow shirt Burton was wearing at the time of his arrest, which Burton admitted he had worn on Sunday, was introduced into evidence; and the neighbor identified it as the shirt (we assume the same color etc.) worn by the man he saw leaving the Wiseman premises.

Two witnesses testified that on Sunday morning Burton was wearing the hat found at the scene of the crime and introduced into evidence.

A police officer testified that after Burton was arrested he found four bank signature cards in Burton's pocket, the signature cards were made out to Mr. & Mrs. Frank Wiseman. Another officer testified he found a checkbook with checks imprinted "Mr. & Mrs. Frank Wiseman" on the seat of the police cruiser in which Burton was brought to the police station.

An employee of a grocery store identified Burton as the man who signed one of the Wiseman checks in payment for groceries on Monday, the day after the incident.

A bank employee identified Burton as the man who cashed one of the Wiseman checks at the bank on the same day and identified the signature cards taken from Burton as being the same cards he gave to Burton.

A state police lab technician testified that he found human blood stains and semen on the yellow shirt worn by Burton and introduced into evidence. He was unable to match the blood stains on the shirt with the blood stains on Mrs. Wiseman's bed because of the small amount on the shirt.

During the course of the investigation, the police interrogated Brad Primous and obtained a statement from him as follows:

"Yesterday on Sun the 22nd of Sept, I was driving a yellow Carmon Giger (sic) —V.W.—I was with Frank Burton who lives at the Avalon Hotel.

"I met Frank at the Avalon Hotel on Sun we were driving around, we were just driving around goofing off—

"Frank Burton was wearing a little wine colored hat, called (the Ringo Hat) —Frank had my hat on—we were drinking beer—

"I hadn't drink (sic) very much—Frank was driving my car or the one I had borrowed from Walts Transmission were (sic) I work—

"About 2:30 P.M. or 3:00 P.M., Frank drove to a big house on a one way street just down from town. He told me he was going to stop & go in the house for awhile—

"Frank Burton went to the front door & knocked on the door—A old woman came to door, she asked Frank Burton what he wanted, he (Frank) told her he wanted to come in. We went in & I set (sic) down in the living room—Frank went back in the bed room with the old woman & was talking to her—

"& saw Frank push the old woman down on the bed, & it looked like he was screwing the old woman—she was fighting Frank Burton, but he had already got on top of her—I told Frank to leave the old woman alone—Frank didn't say anything. He just kept on screwing the old woman.

"I got scared & left the house—I got in the yellow V.W. & left.

"The hat that the officers found at the scene of the rape is my hat & it is the same hat that Frank Burton had on when we went to the house where he attacked the old woman—All I remember about the old woman was she was real old—I

didn't see Frank Burton anymore until I was brought to the police Dept—The above is a true statement given of my own free will about what happened when Frank Burton took me to a house where a old woman lived that he attacked in the bedroom, I completed the 8th grade & understand the above statement & it is a true statement to what happened—"

This statement was signed by Brad Primous and witnessed by two officers.

At a bond hearing, Brad Primous testified in substance to the same facts, and on cross-examination denied that the police officers had "pressured him" into signing the statement.

At the trial, Brad Primous repudiated his statement testifying that he had been with Burton the Sunday morning of the crime, but from noon on until evening had been asleep at a friend's house. He did testify that when he left Burton, the "Ringo hat" was being worn by Burton.

He admitted making and signing the statement and admitted to his testimony at the bond hearing. He testified that he was "scared" when he signed the statement, did not know what he was signing, and hinted that the police officer had used pressure on him to make the statement. His answers to questions as to his reasons for changing his testimony were evasive, and in many instances he did not supply an answer.

The statement was introduced into evidence along with the testimony at the bond hearing. *Jett v. Commonwealth*, Ky., 436 S.W.2d 788 (1969).

Burton, for his defense, denied raping Mrs. Wiseman, denied being in the house where the victim was raped, denied passing the checks, testified he found them on a sidewalk, and denied ever wearing the hat found at the scene. He explained the blood on his shirt as being from a shaving nick, which he had wiped with his shirt. The semem on the shirt was explained as a consequence of having intercourse with a girl he did not name. He claimed an alibi for the approximate time of the rape but could not remember seeing anyone at the club, where he testified he had spent some time, except for the bartender who did not remember seeing Burton. Burton testified that he knew the Wisemans.

One witness was introduced who testified that Brad Primous had parted from Burton at his house about noon and spent the afternoon sleeping.

It is against this background that we consider the principal assignment of error in this case.

After the officer arrested Burton and after twice giving him the "Miranda warning," Burton made an admission to them while being questioned about the rape. The admission, according to one of the police officers, was "that he had been at the Wiseman home on Sunday and he insinuated that Brad Primous who lives at the Avalon Hotel is the one who assaulted Mrs. Wiseman."

On the day of the trial, Burton moved to suppress this admission on the ground that he was so intoxicated that he did not voluntarily, knowingly, and intelligently waive his right against self-incrimination.

The trial court conducted a hearing in chambers on the motion to suppress. The two arresting officers testified they had arrested Burton for drunkenness, that he was intoxicated, but that he was coherent and in their opinion understood what he was doing and saying. The trial court (apparently out of an abundance of caution) decided to suppress the evidence, remarking that "in view of the Miranda case it is dangerous to question a man arrested for public drunkenness about another crime."

In the course of the trial, one of the same officers testifying about the arrest volunteered the following:

"After he was at the police station for a while we advised him of his rights again and where he was questioned about the incident of Mrs. Wiseman.

"On his own free admission, after being advised of his rights, stated that he had been at the Wiseman home."

Burton objected, the trial court sustained the objection and admonished the jury not

to consider the statement. Burton moved for a mistrial which was overruled by the trial court.

Burton argues that this testimony by the police officer, touching on the statement made by him, is a federal constitutional error of such magnitude as to warrant reversal.

■ The principal argument in support of this contention is based upon the holding in *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and our cases following *Jackson* involving an *involuntary confession.* Here we are dealing with an admission which falls short of a confession; and in our opinion the applicable test is discussed in *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and *Watkins v. Commonwealth,* Ky., 465 S.W.2d 245 (1971).

*Chapman* rejected the contention that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful, concluding that there may be some constitutional errors which in the setting of a particular case are so insignificant that they be deemed harmless, stating:

"In fashioning a harmless-constitutional-error rule, we must recognize that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence, or argument, though legally forbidden, finds its way into a trial in which *the question of guilt or innocence is a close one.* What harmless-error rules all aim at is a rule that will save the good in harmless-error practices while avoiding the bad, so far as possible." (Emphasis ours)

*Chapman* declared that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. In applying the standard, the court found that the error, prosecution comments on the defendant's not taking the witness stand, was not harmless and reversed the conviction.

In *Harrington,* the court cited the standard set out in *Chapman* and affirmed the conviction, basing the decision on the evidence in the record which in the opinion of the court was so overwhelming that the error of admitting the confession of co-defendants, who did not take the witness stand, inculpating Harrington, constituted harmless error.

■ Here the circumstantial evidence linking Burton with the crime is so strong and when there is added the statement of Brad Primous and his testimony at the bond hearing, which is substantive evidence, we have no hesitation in holding that the portion of the admission of Burton heard by the jury is harmless beyond a reasonable doubt.

The record clearly refutes Burton's argument that in this case the question of guilt or innocence is in such delicate balance that the effect of any improper statement made to the jury is prejudicial. We are of the opinion that there is not a close question of innocence or guilt here.

■ Burton further argues that in cross-examining a defense witness, who had testified as to Burton's good reputation for truth and veracity, the Commonwealth committed error in attempting to impeach by asking about a specific act of Burton not amounting to a felony.

The simple answer to this assertion is that the trial court sustained an objection and admonished the jury not to consider the question. Burton received all for which he asked. In the absence of a motion for mistrial, we will not consider this assignment of error.

Burton's contention that he was entitled to a directed verdict is without merit.

The judgment affirmed.

REED, C. J., and CLAYTON, JONES, STEPHENSON and STERNBERG, JJ., concur.

LUKOWSKY and PALMORE, JJ., not sitting.